IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| VÍCTOR VELÁZQUEZ-CAUSSADE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> RAMÓN ORTA-RODRÍGUEZ, et al., <br><br> Defendants. | CIVIL NO.: 13-1761 (MEL) |

**OPINION AND ORDER**

## I.   PROCEDURAL HISTORY

On October 10, 2013, Víctor Velázquez Caussade ("Velázquez"), Sylvia M. Meléndez Santiago ("Meléndez"), José M. Pérez Olivares ("Pérez") and Maraliz González ("González") filed an amended complaint pursuant to 42 U.S.C. § 1983 against the Commonwealth of Puerto Rico, Ramón Orta Rodríguez ("Orta") and Benjamin Cruz Lugo ("Cruz"), in their official and personal capacities (collectively "defendants"), alleging that defendants violated their rights under the First, Fifth, and Fourteenth Amendments of the United States Constitution, under §§ 1, 4, 6, and 7 of Article II of the Constitution of the Commonwealth of Puerto Rico, and P.R. Laws Ann. tit. 29, §§ 136-38, 146. ECF No. 5. Specifically, Velázquez and Pérez claim that their duties and responsibilities were taken away because of their political affiliations. Id. Their wives, Mélendez and González, aver that they have suffered mental pain and anguish as a result of learning of defendants' treatment of their husbands. Id. at 5.  On March 18, 2014, the court dismissed Mélendez's and González's First Amendment claims (ECF No. 37) and on March 25, 2014 it dismissed all Fifth Amendment claims in this case (ECF No. 39). Pending before the court are Orta's motion for summary judgment (ECF No. 63), plaintiffs' response in opposition

1

(ECF No. 96), and Orta's reply to plaintiffs' statement of proposed facts (ECF No. 112). For the reasons that follow Orta's motion is granted in part and denied in part.

## II.   UNCONTESTED FACTS

Since January 1, 2013, defendant Orta has been the Secretary of the Puerto Rico Department of Sports and Recreation ("DSR"). ECF Nos. 96-1, at 12, ¶ 13; 112, ¶ 1. Prior to that date he worked at the DSR as an aide to the previous Secretary, David Bernier. Id. Since approximately 2000, Orta has been affiliated with the Popular Democratic Party ("PDP"). ECF Nos. 96-1, at 12 ¶ 14; 112, ¶ 1. Since February 1, 2013, defendant Cruz has served as Director of the Southwest Region of the DSR. ECF Nos. 96-1, at 11-12 ¶ 9; 112, ¶ 1. He is a member of the PDP. ECF No. 96-1, at 12, ¶ 10.

Velázquez has worked at the DSR since 1983. ECF Nos. 96-1, at 10, ¶ 1; 112, ¶ 1. He has worked as Executive Officer II, Director of the Sports Division, and Deputy Director. Id. During New Progressive Party ("NPP") administrations from 1993 to 2000 and 2009 to 2012, he served as Director of the Southwest Region of the DSR. ECF Nos. 96-1, at 11, ¶ 6; 112, ¶ 1. Currently, he is the Deputy Director of the Southwest Region of the DSR. ECF Nos. 64, ¶ 1; 96-1, at 1 ¶ 1. Velázquez is affiliated with the NPP. ECF Nos. 64, ¶ 5; 96-1, at 1, ¶ 5. Velázquez and Orta met on April 12, 2013, for the first time. ECF Nos. 64, ¶¶ 1, 10; 96-1, at 2, ¶¶ 1, 10.

Pérez has worked at the DSR since 1988. ECF Nos. 96-1, at 11, ¶ 3; 112, ¶ 1. Since 1996, he has worked as Transportation Officer of the Southwest Region of the DSR and currently holds that position. Id.; see also ECF Nos. 64, ¶ 3; 96-1, at 1 ¶ 3. Pérez is affiliated with the NPP. ECF Nos. 64, ¶ 5; 96-1, at 1, ¶ 5. Plaintiffs have not been deprived of any part of their salary and have not been transferred, disciplined, or suspended since Cruz assumed the position of Director of the Southwest Region of the DSR. ECF Nos. 64, ¶ 22; 96-1, at 10, ¶ 22.

### III.   LEGAL STANDARD

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992). Summary judgment is granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the litigation.'" Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant presents a properly focused motion "averring 'an absence of evidence to support the nonmoving party's case[,]' [t]he burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). For issues where the nonmoving party bears the ultimate burden of proof, that party cannot merely "rely on the absence of competent evidence, but must affirmatively point to specific facts" in the record "that demonstrate the existence of an authentic dispute." McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). The plaintiff need not, however, "rely on *uncontradicted* evidence . . . . So long as the plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (emphasis in original).

3

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan, 904 F.2d at 115 (citations omitted). There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood . . . ." Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). The court may, however, safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

## IV.    Legal Analysis

### 1.  First Amendment Political Discrimination

Section 1983 provides a cause of action against state actors acting under the color of law who deprive a citizen of rights, privileges, or immunities secured by the Constitution and laws. 42 U.S.C. § 1983.  A claim under § 1983 requires three elements for liability: (1) state action; (2) deprivation of a right; and (3) a causal connection between the defendant's alleged conduct and the deprivation. Gutiérrez–Rodríguez v. Cartagena, 882 F.2d 553, 558 (1st Cir. 1989).  A plaintiff must demonstrate that each defendant was personally and directly involved in the deprivation of his federally protected rights and that the defendant's conduct was the cause in fact of the alleged deprivation. See Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008) (citing Rodríguez-Cirilo v. García, 513 F.3d 301, 306 (1st Cir. 2007)); Gutiérrez–Rodríguez, 882 F.2d at 559; Medina Pérez v. Fajardo, 257 F.Supp.2d 467, 473 (D.P.R. 2003) (citing Caraballo Cordero v. Banco Financiero De Puerto Rico, 91 F.Supp.2d 484, 489 (D.P.R. 2000)).

The First Amendment to the United States Constitution embodies the right to be free from political discrimination. Barry v. Moran, 661 F.3d 696, 699 (1st Cir. 2011). The First Circuit

4

Court of Appeals has held that that right prohibits government officials from "taking adverse action against public employees on the basis of political affiliation, unless political loyalty is an appropriate requirement of the employment." Ocasio–Hernández v. Fortuño-Burset, 640 F.3d 1, 11 (1st Cir. 2011) (internal citations omitted). A *prima facie* case of political discrimination based on the First Amendment consists of four elements: "(1) that the plaintiff and defendant have opposing political affiliations, (2) that the defendant is aware of the plaintiff's affiliation, (3) that an adverse employment action occurred, and (4) that political affiliation was a substantial or motivating factor for the adverse employment action." Lamboy–Ortiz v. Ortiz–Vélez, 630 F.3d 228, 239 (1st Cir. 2010). "Once made, the defendant may then rebut that showing with what is commonly referred to as the Mt. Healthy defense: by proving by a preponderance of the evidence that the governmental agency would have taken the same action," regardless of plaintiff's political affiliation. Reyes-Pérez v. State Ins. Fund Corp., 755 F.3d 49, 54 (1st Cir. 2014) (citing Díaz-Bigio v. Santini, 652 F.3d 45, 52 (1st Cir. 2011)).

Orta raises several arguments that the First Amendment political discrimination claims against him should be dismissed: (1) that he cannot be held responsible under § 1983 because plaintiffs lack a causal link between his alleged conduct and the alleged deprivation of duties; (2) that he had no knowledge of Velázquez's and Pérez's political affiliations; and (3) that Velázquez and Pérez did not experience adverse employment actions. [1]

### a.  Section 1983 Causation

Orta argues—as he did at the motion to dismiss stage—that he was not personally involved in the alleged deprivation of duties, and thus cannot be held liable under § 1983. In

---

[1] It is uncontested that Velázquez and Pérez are members of the NPP and that Orta is affiliated with the PDP. As to the "substantial or motivating factor" prong, Orta argues that it is "moot" given that he purportedly did not know their political affiliations and his position that "there was no actual and actionable adverse employment action against plaintiffs but rather a refusal [on] their part to perform their duties." ECF No. 65, at 11.

denying Orta's argument at the motion to dismiss stage, the court noted that the facts alleged in the complaint "could plausibly indicate that [Orta] instructed Cruz to reduce Plaintiffs' responsibilities to nothing." ECF No. 37. In response to Orta's motion for summary judgment, plaintiffs have adduced evidence to substantiate these allegations. Velázquez testified at his deposition that he and Pérez went to see Cruz in February, 2013, after "a couple of days had passed" from the date Cruz became Regional Director, because they were "not doing anything," and that Cruz indicated that he was following Orta's instructions:

> Q:   Okay, so you say that [Cruz] told you that for you [*sic*] to follow instruction[s] because he also had a boss and he also had to follow instructions.
>
> A:   Yes, he was specific.
>
> Q:   That was my question. When you said that[,] referring to Ramón Orta, did he specifically named [*sic*] the Secretary as the boss from whom he was following instructions?
>
> A:   Yes.
>
> Q:   So, and please tell me if I'm correct of not in this statement, because I am trying to do a composition. [Cruz] tells you, tells you and I quote, 'You have to follow instructions because I myself have a boss, [Orta], and I have to follow his instructions'.
>
> A:   Yes, and he told me to remain in my office until the Secretary give [*sic*] him new instructions.
>
> Q:   And he mentioned the Secretary specifically?
>
> A:   Yes.

ECF No. 95-2, at 15: 1-25.[2] Velázquez continues that he and Pérez went to see Cruz "about two weeks later" due to their lack of duties, and that Cruz reiterated that he was following

---

[2] Orta objects to the admissibility of this testimony, arguing that it is "double hearsay." Both Cruz and Orta, however, are defendants in this case, and their out-of-court statements are thus admissible if offered against them, as statements of party opponents pursuant to Federal Rule of Evidence 801(d)(2). *See, e.g.*, *Ruffin v. City of Boston*,

instructions from his boss, who he previously identified as Orta, and that Velázquez and Pérez should remain in their offices until they received further instructions. Id. at 16: 10-12, 17: 4-7. Accordingly to Velázquez, they met with Cruz "one or two weeks later" regarding their alleged lack of duties, and Cruz "repeated . . . the things that he said in the second meeting."[3] Id. at 22: 21-24.

Government officials "can be held liable [under § 1983] for the acts of their subordinates if they engaged in a 'supervisory encouragement, condonation or acquiescence.'" Martínez-Velez v. Rey-Hernandez, 506 F.3d 32, 41 (1st Cir. 2007) (citing Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 902 (1st Cir. 1988)); see also Maldonado–Denis v. Castillo Rodríguez, 23 F.3d 576, 583 (1st Cir. 1994) ("[A] supervisor . . . may be liable under section 1983 if he formulates a policy or engages in a practice that leads to a civil rights violation committed by another."). To be sure, Orta denies giving instructions to Cruz or any other employee regarding Velázquez's and Pérez's job tasks and assignments, which is a credibility matter that the jury can consider at trial. ECF No. 64, ¶ 19. Orta also asserted at his deposition that he was unaware what their official duties and responsibilities were in the Southwest Region. ECF No. 64-5, at 10: 3-6. Nevertheless, if a jury were to credit Velázquez's testimony and find that Orta gave instructions to Cruz not to assign them work, that jury could reasonably conclude that Orta provided "supervisory encouragement, condonation or acquiescence," which directly led to Velázquez's and Pérez's lack of responsibilities.

---

146 Fed.Appx. 501, 506 (1st Cir. 2005) (discussing admissibility of "double hearsay" statements pursuant to Federal Rule of Evidence 801(d)(2)).

[3] One portion of Velázquez's deposition states that in the third meeting Cruz repeated "exactly the same thing," leaving it ambiguous as to whether Cruz said the same thing as in the first meeting or as in the second. Later in his deposition, however, Velázquez clarified that he was referring to the second meeting when stating that in the the third meeting Cruz said "exactly the same thing." ECF No. 95-1, at 20: 21-23, 22: 21-24,

### b.  Knowledge of Political Affiliation

Orta stated in his deposition that he did not know Velázquez's or Pérez's political affiliation prior to the filing of the complaint in the instant case. ECF No. 64-5, at 11: 21-24. Plaintiffs respond that Velázquez is "a well-known member of the NPP in Mayagüez" and that he is well-known as someone identified with that party among his DSR colleagues in both San Juan and Mayagüez. ECF No. 96-1, ¶¶ 5-6. They note that Velázquez served as Regional Director of the Southwest Region of the DSR for the duration of the NPP administrations from 1993 to 2000 and from 2009 to 2012 and that he was a NPP candidate for Representative of the Puerto Rico House of Representatives in the 2000 elections. Id. ¶ 6. As to Pérez, plaintiffs merely state that he "is a known member of the NPP at the DSR." This evidence does not suffice to meet plaintiffs' *prima facie* burden of showing that Orta knew their respective political affiliations. The conclusory statement that an employee is a "well-known" or "known" member of a political party does not permit a jury to reasonably conclude that a particular individual was aware of the employee's political affiliation. See González-de-Blasini v. Family Dep't., 377 F.2d 81, 85-86 (1st Cir. 2004) (affirming the dismissal of a complaint where the plaintiff was alleged to be a well-known supporter of the NPP, had held a trust position under the previous NPP administration, and defendant had expressed interest in giving her position to a PDP member, finding that this fell short of evidence that defendant knew of plaintiff's political affiliation). Nor can Orta's knowledge of Velázquez's political affiliation be imputed from his candidacy for the House of Representatives in the 2000 election. The jury would need to assume that Orta knew the candidates in that election, approximately thirteen years prior to becoming Secretary of the DSR, and that he remembered the candidates for Representative and their respective political parties for the next thirteen years. Although it is uncontested that Orta has been affiliated with the

PDP since approximately 2000, it would nevertheless be speculative to conclude that he was in Puerto Rico at that time, let alone that he was aware of Velázquez's candidacy.

Plaintiffs next argument is that Orta was aware of their political affiliations since at least April 10, 2013, when Pérez claims to have approached Orta at an event. According to Pérez's deposition testimony, he told Orta "[t]hey are doing political persecution against me" and Orta replied, "[l]eave it alone, I'll deal with it".  ECF No. at 24: 15-17.[4] Pérez does not state that he told Orta what his political affiliation was, and it is not clear from Pérez's testimony who he is referring as "they." Drawing all reasonable inferences in favor of plaintiffs, a reasonable jury could not conclude that Orta learned Pérez's political affiliation from the evidence to which plaintiffs have cited regarding this interaction.

Next, plaintiffs assert that on June 26, 2013, they sent Orta a joint letter that stated, in pertinent part:

> As we have informed you on previous occasions, we, the undersigned, are career employees with the Sports and Recreation Department in Mayaguez. Our tasks and responsibilities have been removed by the current Director of the Region, [Cruz], who tells us that you have given instructions not to assign tasks to us because we are affiliated with the [NPP].

ECF No. 96-6, at 1. Orta raises an authenticity objection to the admissibility of this letter.[5] ECF No. 112, ¶ 34. Pérez stated in his deposition that he and Velázquez addressed a letter to the Secretary and that Pérez "brought it to him on June 28, 2013." ECF No. 96-4, at 23: 20-23.

---

[4] It is uncontested that Velázquez interacted with Orta have at another event, on April 12, 2013. ECF Nos. 96-1, at 17 ¶ 17; 112, ¶ 1. Velázquez claims that he informed Orta that "he was without any duties as Deputy Director of the Southwest Region of the DSR." ECF No. 96-1, ¶ 40. However, Velázquez conceded during his deposition that during their encounter he only told Orta that he "was inside [his] office and that the instructions were to remain inside the office until [he and Pérez] receive new instructions," and that he did not address his belief that he was being politically discriminated against during the counter. ECF No. 95-2, at 25: 6-25, 26: 1-9.

[5] Orta also claims in his reply statement of facts that plaintiffs did not produce this letter to him during their initial disclosures, arguing that it should be inadmissible pursuant to Federal Rule of Civil Procedure 26. ECF No. 112, at 6. Plaintiffs have not replied to this allegation. The court expresses no opinion at this juncture as to whether the June 26, 2013letter should be excluded at trial for the alleged failure to produce it in plaintiffs' initial disclosures or whether the letter can be properly authenticated at trial.

Velázquez admitted that he was not present when Pérez purportedly delivered "the letter," but stated "we took the opportunity when [Pérez] went to San Juan to get the registration stickers . . . to bring the letter to the Secretary's office." ECF No. 95-2, at 44: 22-25, 45: 1-5. Neither Pérez nor Velázquez refers to the contents of such a letter in their deposition, such that a finding could be made that they were referring to the June 26, 2013 letter quoted above that they have submitted in opposition to Orta's motion for summary judgment. Additionally, even assuming for argument's sake that they were referring to that letter in their depositions, they have not cited to any evidence with specific citations to the record that Orta read the letter Pérez that delivered on June 28, 2013. Given these gaps in the record, plaintiffs have not presented evidence to authenticate the letter, and it thus cannot be used to substantiate their claim that Orta knew their political affiliations. See Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000) (holding that a "failure to authenticate" a document at summary judgment "precludes consideration of" that document).

While plaintiffs' first three arguments that Orta was aware of their affiliation with the NPP are unavailing, they have nevertheless cited to evidence from which a reasonable inference can be drawn that Orta was aware of their political affiliations. Velázquez's testimony regarding the meeting he and Pérez had with Cruz does not suffice to establish that Orta knew their political affiliations for two reasons. First, Velázquez's suggests that only "a couple" of days had passed since Cruz had assumed the Regional Director postion, during which they lacked job duties, ECF No. 95-2, at 15: 3-6, which does not "reach the threshold of constitutional injury." See Agosto-de-Feliciano, 889 F.2d at 1219 (noting that an employee must show at least "a permanent, or at least sustained" worsening of conditions, indicating that the change must last "longer than a week or two"). Second, Velázquez does not state that Cruz mentioned their political affiliations during the first meeting. The fact that Cruz purportedly had instructions from

Orta not to assign Velázquez and Pérez responsibilities during his first two days of work does not give rise to a rational conclusion that Orta in fact knew their political affiliations. However, on the second encounter, which occurred "about two weeks later," Velázquez and Pérez were allegedly still without work when Cruz said to them:

> 'I'm following my boss's instructions and you have to follow minds [*sic*]. Stay in your offices until you receive new instructions . . . This is what you get for having supported Luis Fortuño and being an active member of the [NPP].'

ECF No. 95-2, at 17: 5-10. As previously noted, Velázquez also testified that they met with Cruz on a third occasions "one or two weeks later" and that Cruz said the same thing to them as he had said in the second meeting. By the third meeting, over two weeks had elapsed since they were purportedly without responsibilities, clearing reaching the durational "threshold of a constitutional injury." See Agosto-de-Feliciano, 889 F.2d at 1219. The comments that Cruz allegedly made during the second and third meetings pertain directly to their membership in the NPP. Compare with González–Piña v. Rodríguez, 407 F.3d 425, 432 (1st Cir. 2005) (holding that, even if the opposing party mayor was aware of plaintiff's support for a rival mayoral candidate in the primary, that, without more, is insufficient to establish political animus). Moreover, they were not off-hand remarks but relate directly to the alleged adverse employment action in question. Given the juxtaposition of Cruz's statement that he was following instructions from his boss, Orta, in ordering them to stay in their offices until they received other instructions, and his assertion that "this is what they get" for being NPP members, a reasonable jury could conclude that Orta knew they were NPP members—in other words, that he gave Cruz the directive to order Velázquez and Pérez to remain in their offices without work because of their political affiliations.

### c.  Adverse Employment Action

Where an employee suing under § 1983 claims that a diminution in his or her duties occurred, the court must "determine whether the new work conditions would place substantial pressure on even one of thick skin to conform to the prevailing political view. This level of burden is reached . . . when the employer's challenged actions result in a work situation 'unreasonably inferior' to the norm for the position." Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1219 (1st Cir. 1989).[6] To meet this standard, plaintiff must establish a change in conditions by clear and convincing evidence. Id. at 1220 (noting that proof of an employer's political motivation need only be proven by a preponderance of the evidence). In order to determine whether such a reduction in duties has occurred, "the factfinder should canvass the specific ways in which the plaintiff's job has changed" in order to reach a determination as to "whether the 'new' job is unreasonably inferior to the one she previously had." Id. at 1219-20; see also Ortiz García v. Toledo Fernández, 405 F.3d 21, 23 (1st Cir. 2005) (explaining that in reduction of responsibilities cases the factfinder must determine if "the position she occupies

---

[6] The year after the First Circuit Court of Appeals decided Agosto-de-Feliciano, the Supreme Court of the United States decided Rutan v. Republican Party of Ill., stating, in dicta, that "[t]he First Amendment . . . protects state employees . . . from even an act of retaliation as trivial as failing to hold a birthday party . . . when intended to punish [them] for exercising [their] free speech rights." 497 U.S. 62, 76 n. 8 (1990) (internal quotation marks and citation omitted). The First Circuit has considered whether Agosto-de-Feliciano's "unreasonably inferior" standard applies in political discrimination cases in light this language from Rutan. Although it has not directly ruled on this issue, the First Circuit has assumed, arguendo, on numerous occasions that Agosto-de-Feliciano's standard continues to apply after Rutan in cases of alleged personnel actions short of demotions or transfers, and has offered a rationale for retaining the standard in such cases:

> We do not regard [Rutan's] colorful rhetoric as necessarily foreclosing something like the 'unreasonably inferior' rule for personnel actions short of demotions or transfers. The Rutan Court was concerned with deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy, a formulation similar to Agosto-de-Feliciano's standard . . . .

Acosta-Orozco v. Rodríguez-de-Rivera, 132 F.3d 97, 101 n. 5 (1st Cir. 1997) (internal quotation marks and citation omitted); see also Ortiz García v. Toledo Fernández, 405 F.3d 21, 23 (1st Cir. 2005) (citing Acosta-Orozco v. Rodríguez-de-Rivera, 132 F.3d 97, 101 n. 5 (1st Cir. 1997)); Acevedo-García v. Vera Monroig, 204 F.3d 1, 12 (1st Cir. 2000); Nereida-González v. Tirado-Delgado, 990 F.2d 701, 705 (1st Cir. 1993).

now materially differs from the position as it existed previously."). "[T]he factfinder's responsibility, in brief, is to determine whether the employee has retained duties, perquisites and a working environment appropriate for his or her rank and title." Agosto-de-Feliciano, 889 F.2d at 1220.

### i.       Plaintiff Velázquez

Velázquez argues that since Cruz assumed the position of Regional Director, a typical day for him as Deputy Director of the Southwest Region of the DSR consists of sitting in his office and staring at the walls. Velázquez stated in his deposition that several days after Cruz became Regional director, on February 6, 2013:

> I went to see [Cruz] and told him that I had noticed that everyone had started working and I told him that I would like to meet with him to discuss the transition report. He told me he'll meet with me later to discuss the report and I asked him what my duties were going to be, because I am not used to just sitting down and not doing anything. I've always been in the region moving around and I had been without any duties for several days.

ECF No. 95-2, at 14: 8-22. About two weeks later Velázquez purportedly went to Cruz, and stated: "Benjamin we hear [sic] because we have no duties, staring at a wall for seven and a half hours."[7] Id. at 16: 4-5, 10-25 (internal quotation marks omitted). Finally, according to Velázquez's deposition, he and Pérez met with Cruz for a third time, "a week or two later," and again complained that they had no job functions assigned to them. Id. at 17: 12, 18: 2-3, 19: 1-4. In addition to Velázquez's testimony regarding the meetings with Cruz, Velázquez's deposition, taken on August 25, 2014, also states:

---

[7] Plaintiffs' evidence that Velázquez told Cruz he and Pérez lacked duties and stared at walls during the workday is technically hearsay, if offered to establish that they in fact lacked duties at that time. Fed.R.Evid. 801. Defendants have not raised a hearsay objection in response to plaintiffs' proposed facts that are supported by this testimony (See ECF Nos. 95-1, ¶¶ 20-22, 32-35; 103-1, ¶¶ 20-22, 32-35. Regardless, in order to cure the hearsay problem, Velázquez can take the stand and adopt the prior statement as his testimony, if he chooses to do so. See, e.g., Amarin Plastics, Inc. v. Maryland Cup Corp., 946 F.2d 147, 153 (1st Cir. 1991) (citing Fed.R.Evid. 801 advisory committee's note (d)(1)).

> Q:      Could you describe for us a typical day for you as the deputy director of the Western region of the Department Of Recreation and Sports?
>
> A:      Now, at this time?
>
> Q:      Yes, yes.
>
> A:      Nothing, sitting in an office staring at the wall.

Id. at 9: 24-25, 10: 1-5.

Lacking from plaintiffs' deposition testimony is a description of which particular duties he was performing prior to the change in administration. The only evidence regarding Velázquez's "old" job is his statement that he was not used to sitting around without work and the vague statement that he had always been "in the region moving around." This testimony is sufficient to allow a reasonable factfinder to determine that *some* change in Velázquez's job duties occurred subsequent to Cruz's assumption of the Regional Director role, but fails to elucidate what precisely changed, in order to enable the factfinder to make a comparison between his old and new positions. Complicating the factfinder's task of determining whether Velázquez experienced a deprivation or removal of the duties of the Deputy Director position is the fact that prior to Cruz becoming Regional Director, Velázquez served as *de facto* Regional Director, while retaining his career position as Deputy Director. In cases in which an employee held a trust position for a limited duration and also retained a career position, the removal of the duties associated with that trust position after a change in administration does not constitute an adverse employment action. See Ortiz García v. Toledo Fernández, 405 F.3d 21, 24 (1st Cir. 2005). ("While Ortiz held the Agronomist IV position before being promoted to a trust position, she has not presented evidence comparing her duties to her duties when she previously held the [Agronomist IV] position. Thus, a factfinder would have no way to know whether the position she occupies now materially differs from the position as it existed previously."); and Agosto-de-

Feliciano, 889 F.2d 1209 ("An employee who previously had predominantly exciting and responsible work and who was left with only a few routine and technical assignments could be found to meet [the 'unreasonably inferior'] standard so long as his prior duties reflected the usual nature of his position rather than his prior high status as a member of the then-prevailing party.").

Velázquez's job description and duties form for the Deputy Director of the Southwest Region provides some insight into the "norm" for his career position, filling in the gap from his deposition testimony. The form, which he signed on July 7, 2009, states:

> Describe the work and duties *that you perform* in order of importance; identify and list the essential duties of the position first, followed by the secondary duties and tasks. This is the most important part of the form. Use your own words and describe your duties in a clear way that would allow people who are not familiar with your job to understand exactly what it is *that you do*.

ECF No. 68-4 (emphasis added). As such, it is not a generic job description form for the Regional Director position, but solicits a description of the duties of the position that he was in fact performing and what he was doing in his role as of the date he signed the form. It contains a list of fourteen duties in response, which include: collaborating in planning, coordinating, supervising, and directing activities carried out in the region; collaborating in preparing and following up on work plans; standing in for the Regional Director when he is absent or on vacation; collaborating in formulating and evaluating the objectives and achievements of the region; drafting memoranda and communications for the Director to sign; attending and investigating citizen complaints; collaborating in supervising and evaluating personnel; preparing and submitting work reports; coordinating with central and regional offices to search for information and follow up on cases; providing information to government employees and visitors about the services the DSR offers; supervising construction, repair and / or maintenance projects at regional facilities; collaborating in studies aimed at maximizing the utilization of

available resources in the region to develop activities; collaborating in drawing up and adopting quality control and performance rules in the region's recreational and athletic activities; and participating in bidding processes, as needed. Id.

If a reasonable jury were to credit Velázquez and find that after Cruz became Regional Director Velázquez lacked any duties, staring at the walls in his office during the workday, it could determine that his work situation was "unreasonably inferior to the norm," as compared to the duties he listed in the job description. Orta argues that neither Velázquez nor Pérez experienced adverse employment actions in the form of a reduction in duties because what they allege was a "deprivation of functions [was] actually a refusal from them to perform their functions." ECF No. 65, at 11. Cruz states in an affidavit that Velázquez "distanced himself from the rest of the employees at the Region" and claims that he assigned Velázquez to "be in charge and oversee all contracts," but that Velázquez "did not want to perform the job and refused to do so." ECF No. 64-11, ¶¶ 3-4. At his deposition, Cruz also indicated that he assigned Velázquez work regarding "maintenance contracts of the Stadium" that was never performed. ECF No. 72-6, at 4: 1-21. Whether Velázquez's lack of work was the result of his refusal to perform the duties he was assigned is a credibility issue for the jury to consider. Drawing all reasonable inferences in favor of the non-movants, a jury could find that Velázquez was deprived of duties appropriate for his position. In addition to his testimony that he complained to Cruz about sitting around without work, Velázquez testified at his deposition that Cruz said to him, "Well, if I give you your duties back, are you willing to erase the past and just start off a new, on a clean slate[?]".[8] ECF No. 96-2, at 47: 20-22. From this statement, as well as Cruz's comment that

---

[8] It appears that this conversation took place after the complaint was filed in this case, as according to Velázquez Cruz was willing to "give back [their] duties" if they "dropped" their cases. ECF No. 96-2, at 47-48. In response to plaintiffs' proposed facts citing to evidence of these statements defendants do not object that the statements are inadmissible pursuant to Federal Rule of Evidence 408, as statements made during an attempt to compromise the claims or settle the case. Thus, defendants have waived the objection that pursuant to Rule 408 the court should not

"[t]his is what you get for having supported Luis Fortuño and being an active member of the [NPP]," which he rendered in response to their complaints that they lacked duties, a jury could reasonably infer that Cruz in fact deprived Velázquez of duties that correspond to his Deputy Director position. Taking into account these statements, as well as a comparison of the evidence regarding Velázquez's duties while Cruz was Regional Director and the duties he reported performing at the time he filled out his job description form, defendants' request for summary judgment of Velázquez's First Amendment political discrimination claim is denied.

## ii.    Plaintiff Pérez

Like Velázquez's job description form, Pérez's Transportation Officer job description form, which he signed on March 26, 2009, instructs him to describe the work and duties "that [he] perform[s]." ECF No. 68-5. The duties enumerated in Pérez's job description form include: recording and keeping control of official vehicles; inspecting all vehicles under his charge to ensure they are in "optimal condition"; ensuring that vehicles are repaired and maintained either in the Transportation Office or in private shops; preparing requests for the purchase of parts; keeping vehicle files and repairs up to date; asking the General Services Administration to "decommission" vehicles when they can no longer be used; submitting monthly gasoline, diesel, and oil consumption reports and submitting a monthly report on vehicle usage; filling out traffic accident forms; coordinating the process of tires being mounted on vehicles; coordinating the presence of drivers for special activities; preparing requests for motor vehicle accessories; keeping administrative control of forms and requests for vehicle registrations, materials, drivers'

---

consider such evidence at the summary judgment stage. See, e.g., Thomas & King, Inc. v. Jaramillo, No. 08–191, 2009 WL 649073, at *3 (E.D.Ky. Mar.10, 2009) ("Evidence not meeting the requirements of Rule 56(e) 'may be considered by the district court unless the opposing party affirmatively raises the issue [of] the defect.' " (quoting Bennett v. Univ. Hospitals of Cleveland, 981 F.Supp. 1065 (N.D.Ohio 1997))); Jackim v. Sam's East, Inc., 378 F. App'x 556, 564 (6th Cir.2010) (noting that a party waives evidentiary objections to summary judgment materials by not raising them to the trial court). However, the court expresses no opinion as to how this issue would be ruled upon if raised at or prior to trial.

licenses of transportation personnel, expiration dates, vehicle inspection seals, and renewals. ECF No. 68-5. Additionally, Pérez's job description form indicates that he obtains work via detailed instructions regarding his tasks, suggesting that it is incumbent upon his superiors to assign him work, rather than his independent responsibility to seek out and complete the tasks contained in his job description. Id.

Pérez argues that out of the twelve functions included in his job description, he "only performs the one related to the filing of gasoline consumption reports." ECF Nos. 95; 95-1, at 15, ¶ 26. He cites to evidence that the remainder of his job functions, as defined in the job description for the Transportation Officer position, have been assigned to other DSR employees or have not been assigned to him. ECF No. 95-4, at 3: 14-25, 4: 1-8, 5: 8-17, 6: 3-25, 7: 1-17, 9: 21-25, 10: 1-25, 11: 1-17, 12: 1-25, 13: 1-25, 14: 1-17, 27: 5-22. Pérez indicated in his deposition that the tasks of registering and maintaining control of the entry and exit of official vehicles, inspecting vehicles, following up on repairs and maintenance of vehicles at the transportation office or in private shops, and preparing requisitions for buying parts were all performed by an individual named Edwin González, subsequent to Cruz becoming Regional Director. Id. With regard to the task of maintaining files of vehicles and keeping repairs up to date, Pérez stated "they are not letting me go to the shop to be able to fulfill the duty fully," and as to asking the General Service Administration to decommission vehicles, he indicated "they don't have me do that." Id. at 12: 5-6, 13-23. Pérez also stated that although there have been accidents with official vehicles, he has not been assigned the task of filling out traffic accident reports, contained in his job description, and that he is "being prevented" from coordinating the installation of tires on vehicles, preparing requisitions for motor vehicle accessories, and keeping administrative control over forms and requests for vehicle registrations, material, drivers' licenses, inspection stamps, and their respective renewals. Id. at 13: 21-25, 14: 1-11. In view that Pérez's job description is

not merely a boilerplate form for the Transportation Officer position, but in fact contains a list of job functions he says he performed at the time he completed the form, the fact that he claims to only have been assigned one of the twelve functions in his job description after Cruz became Regional Director could lead a reasonable jury to find that he experienced an adverse employment action.[9]

As with Velázquez, Orta argues that Pérez did not experience an adverse employment action because his lack of work was the result of his own "poor attitude" and refusal to perform his duties. Again, whether Pérez in fact refused to perform his duties is an issue for the jury. All credibility determinations must be made in favor of plaintiffs in evaluating whether summary judgment is warranted, and according to Pérez's testimony the majority of his job functions were not assigned to him.

Finally, Orta points to a letter Cruz sent to Pérez on February 11, 2013, which states, among other things:

> I need you to submit to me a detailed, updated report on the condition of each official vehicle. Likewise, we need to check the inventory of all the materials you stored in the ticket office in order to place it in the custody of the Warehouse Keeper, Mr. William Morales Collazo. I inform you that you should not hesitate to comment to me about any situation regarding inventory that you believe I should be informed of. This entire process is for the benefit of the agency that we work for.
>
> …
>
> You shall ensure that each vehicle's log is kept up to date and that before each crew leaves every day, each vehicle is checked for the employee's safety. This way, we are going to try to keep the fleet in the best possible conditions. Each vehicle will also be checked in the afternoon when returned by the crew. You can prepare a format to follow this process. This way, if an audit is conducted,

---

[9] Plaintiffs also present evidence that Cruz moved Pérez to an office "which would get wet" and that did not have a computer or a telephone. ECF Nos. 96-1, ¶ 23. He presents no evidence regarding the state of his old office, however, or whether a telephone and computer are the norm for the position.

> everything is demonstrated in writing. At the end of each month,
> you will prepare the monthly report as I know you already do.

ECF No. 68-7. Whether or not this letter discredits Pérez's claim that he was deprived of appropriate duties for his position as Transportation Officer is a matter for the jury to consider. While this letter may serve to impeach Pérez's claim that he only retained the duty of filing a monthly gasoline consumption report and Velázquez's testimony that both he and Pérez lacked any responsibilities in the first few weeks of Cruz's tenure, the court cannot weigh the evidence in evaluating Orta's motion for summary judgment. The assignments contained in the letter would not necessarily prevent a jury from concluding that Pérez experienced a material change in his duties; therefore, summary judgment is not warranted. In sum, Orta's claim that the case should be dismissed for lack of evidence that Pérez experienced an adverse employment action is denied.[10]

### 2.  Qualified Immunity[11]

The doctrine of qualified immunity protects defendants in their individual capacities from liability for money damages." Roldan-Plumey v. Cerezo-Suárez, 115 F.3d 58, 66 (1st Cir, 1997). To determine if a public official is entitled to qualified immunity, the court examines: "(1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue." Mihos v. Swift, 358 F.3d 91, 102 (1st Cir. 2004) (citation omitted). Orta's brief argument for qualified immunity is somewhat repetitive of his argument that he was not personally involved in depriving Velázquez or Pérez of their duties: "Plaintiff[s] ha[ve] failed to allege any facts that would tend to prove that Defendant Orta Rodríguez himself committed

---

[10] Orta does not raise a Mt. Healthy defense in his motion for summary judgment. See ECF No. 65.

[11] In ruling on Orta's motion to dismiss, the court denied his request for qualified immunity without prejudice. See ECF No. 37, at 1-2.

any malicious acts or had the intention to violate any clearly established constitutional right and of which a reasonable person would have known." ECF No. 65, at 14. The court noted in denying codefendant Orta's motion to dismiss plaintiffs' political discrimination claims that plaintiffs' allegations in the amended complaint, taken as true, establish a constitutional violation and sufficiently allege that Orta was personally involved in the reduction of Velázquez's and Pérez duties. See ECF No. 37, at 2. Furthermore, there is no doubt as to whether depriving duties based on an employee's political affiliation is illegal: "[F]or nearly a quarter of a century, First Circuit precedent has clearly established that reduction in responsibility, when alleged under the auspices of political discrimination, violates the First Amendment. . . ." Dávila-Torres v. Feliciano-Torres, 934 F.Supp.2d 359, 370 (D.P.R. 2013) (denying the defendant's request for dismissal on the basis of qualified immunity (citing Torres-Santiago v. Municipality of Adjuntas, 693 F.3d 230, 242 (1st Cir. 2012); Agosto-de-Feliciano, 889 F.2d at 1219)). Based on the current state of the law a reasonable official would have understood that removing an employee's duties because Velázquez and Pérez belong to the NPP would violate the First Amendment. Therefore, Orta is not entitled to qualified immunity.

### 3. Fourteenth Amendment Equal Protection

Like codefendants Cruz and the Commonwealth of Puerto Rico, Orta is moving to dismiss all remaining claims against him in this case. See ECF Nos. 57, 63. Cruz and the Commonwealth raised the argument that plaintiffs' Fourteenth Amendment Equal Protection Clause claims should be dismissed because they are based on the same facts that underlie plaintiffs' First Amendment political discrimination claims. That argument also applies to the Fourteenth Amendment equal protection claims against Orta.

An equal protection claim alleging political discrimination, merely restates a First Amendment political discrimination claim and . . . [should be] considered under the First

Amendment." <u>Uphoff Figueroa v. Alejandro</u>, 597 F.3d 423, 426, 430 n. 8 (1st Cir. 2010); <u>Pagán v. Calderón</u>, 448 F.3d 16, 36 (1st Cir. 2006); <u>see also</u> <u>Quiles Santiago v. Rodríguez-Díaz</u>, 851 F.Supp. 411, 426 (D.P.R. 2012) (dismissing equal protection claim that "merely reiterate[d]" First Amendment political discrimination claim); <u>Marrero-Sáez v. Municipality of Aibonito</u>, 668 F.Supp.2d 327, (D.P.R. 2007) (same). A review of plaintiffs' amended complaint reveals that their First and Fourteenth Amendment claims rest on the same allegations of political discrimination. <u>See</u> ECF No. 5. Therefore, they are properly analyzed under the First Amendment political discrimination framework, and plaintiffs' Fourteenth Amendment claims are dismissed with prejudice.

## V.   CONCLUSION

None of Orta's arguments for summary judgment carry the day in this case. His personal involvement in depriving Velázquez and Pérez of their job responsibilities can be inferred from Cruz's statements that he was acting pursuant to Orta's instructions, satisfying the standard for supervisory liability under § 1983. Similarly, Orta's knowledge as to their political affiliations can be imputed from Cruz's comments, which create a reasonable inference that the instructions from his boss not to assign Velázquez and Pérez work were due to their political affiliations. As to whether Velázquez and Pérez experienced adverse employment actions, Orta's argument that their lack of work was based on their own refusal to carry out  their responsibilities is an issue of fact that the court cannot determine at the summary judgment stage. The lists of duties contained in their job descriptions contrasted with their accounts of their limited duties with Cruz as Regional Director could allow a reasonably jury to conclude that their "job duties and working environment were substantially altered," such that they experienced a change in conditions that amounted to an adverse employment action. <u>Rodríguez García v. Miranda Marín</u>, 610 F.3d 756, 767 (1st Cir. 2010). As to whether a rational jury could conclude that their political affiliations

was a substantial or motivating factor leading to the deprivation of duties, although Orta has not briefed this matter, the record nevertheless contains sufficient evidence to satisfy the last prong of the *prima facie* standard, in the form of Cruz's comments such as: "This is what you get for having supported Luis Fortuño and being an active member of the [NPP]" and "[d]on't expect anything during the next four years and don't be surprised if you receive a transfer [to] the Eastern region of Puerto Rico and eventually a removal." Drawing all reasonable inferences in favor of plaintiffs, as the non-movants, defendants' motion requesting summary judgment with respect to the First Amendment claim is DENIED. Orta's request for dismissal on qualified immunity grounds is also DENIED, as the First Circuit jurisprudence is clear that reducing an employee's duties on the basis of their political affiliation violates the First Amendment. Because plaintiffs' First and Fourteenth Amendment claims involve the same allegations, Orta's motion to for summary judgment is GRANTED as to plaintiffs' Fourteenth Amendment claims and all Fourteenth Amendment claims in this case are DISMISSED WITH PREJUDICE.[12]

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 31st day of July, 2015.

s/Marcos E. López
U.S. Magistrate Judge

---

[12] With respect to the supplemental law claims under Puerto Rico law, Orta has not developed his argument. Therefore, to the extent that entry of summary judgment is being requested as to any remaining supplemental claims, said request is denied.