## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| VÍCTOR VELÁZQUEZ CAUSSADE, et al. | |
| Plaintiffs, | |
| v. | CIVIL NO.: 13-1761 (MEL) |
| RAMÓN ORTA RODRÍGUEZ, et al. | |
| Defendants. | |

## OPINION AND ORDER

### I.   BACKGROUND

Víctor Velázquez Caussade ("Velázquez") and José Pérez Olivares ("Pérez") were employees of the Commonwealth Department of Sports and Recreation in Mayagüez. Defendant Benjamín Cruz Lugo ("Cruz") was the Regional Director and Ramón Orta Rodríguez ("Orta") was the Secretary of the Department. On October 10, 2013, Velázquez, Sylvia M. Meléndez Santiago ("Meléndez"), Pérez, and Maraliz González ("González") filed an amended complaint pursuant to 42 U.S.C. § 1983 against the Commonwealth of Puerto Rico (the "Commonwealth"), Orta, and Cruz, in their official and personal capacities, alleging violations of their rights under the First, Fifth, and Fourteenth Amendments of the United States Constitution, under §§ 1, 4, 6, and 7 of Article II of the Constitution of the Commonwealth of Puerto Rico, and P.R. Laws Ann. tit. 29, §§ 136-38, 146. ECF No. 5. On March 18, 2014, the court dismissed Meléndez's and González's First Amendment claims (ECF No. 37) and all remaining claims by the two on August 7, 2015 (ECF No. 154). On March 25, 2014 the court dismissed all Fifth Amendment claims in this case (ECF No. 39). On July 31, 2015, all Fourteenth Amendment claims were dismissed. ECF No. 127.

On August 8, 2015, a federal jury found in favor of the plaintiffs, but declined to find liability against Orta. Specifically, the jury found that both Velázquez and Pérez had experienced a change in their employment making their work situation unreasonably inferior to the norm for their positions. The jury further found that Cruz knew the political affiliations of both Velázquez and Pérez, that those affiliations were a substantial and motivating factor in the adverse employment action against both, and that his acts or omissions caused the politically motivated deprivation of the duties of both. ECF No. 167, at 1, 8.  The jury found that no amount of money was required to compensate each employee for their damages caused by the deprivation of duties. Id. at 3, 10.  The jury additionally found that Cruz's conduct was malicious or in reckless disregard of both Velázquez and Pérez's First Amendment rights, and accordingly awarded each two hundred and fifty thousand dollars ($250,000) in punitive damages. Id. at 3, 5. Currently pending before the court are the motion for judgment as a matter of law (ECF No. 188) and motion to set aside verdict (ECF No. 172) both filed by Cruz and the Commonwealth of Puerto Rico (collectively "defendants").

## II.   MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.  Standard of Review

Federal Rule of Civil Procedure 50 provides, in pertinent part:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed R. Civ. P. 50(a). Review of a Rule 50 motion is strongly weighted toward preservation of the jury verdict, and the "court is without authority to set aside a jury verdict and direct entry of a contrary verdict unless the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Keisling v. SER–Jobs for Progress, 19 F.3d 755, 759–60 (1st Cir. 1994); see N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 26 (1st Cir. 2005). "When ruling upon a motion for judgment notwithstanding the verdict, the trial judge may not evaluate the credibility of the witnesses, the weight of the evidence, or attempt to resolve conflicting testimony, because credibility questions are within the exclusive province of the jury. The judge must view the evidence in the light most favorable to the non-movant and grant that party every reasonable inference that the jury might have found in its favor." Acevedo García v. Vera Monroig, 213 F.Supp.2d 42, 47 (D.P.R.2002) (internal citations omitted). Defendants argued their Rule 50 motion originally at trial. ECF No. 162. The court held it in abeyance at that time and revisits it here.

B.  Political Discrimination

The First Amendment to the United States Constitution embodies the right to be free from political discrimination. Barry v. Moran, 661 F.3d 696, 699 (1st Cir. 2011). The First Circuit Court of Appeals has held that that right prohibits government officials from "taking adverse action against public employees on the basis of political affiliation, unless political loyalty is an appropriate requirement of the employment." Ocasio–Hernández v. Fortuño-Burset, 640 F.3d 1, 11 (1st Cir. 2011) (internal citations omitted). A *prima facie* case of political discrimination based on the First Amendment consists of four elements: "(1) that the plaintiff and defendant have opposing political affiliations, (2) that the defendant is aware of the plaintiff's affiliation, (3) that an adverse employment action occurred, and (4) that political

affiliation was a substantial or motivating factor for the adverse employment action." <u>Lamboy–Ortiz v. Ortiz–Vélez</u>, 630 F.3d 228, 239 (1st Cir. 2010). "Once made, the defendant may then rebut that showing with what is commonly referred to as the <u>Mt. Healthy</u> defense: by proving by a preponderance of the evidence that the governmental agency would have taken the same action," regardless of plaintiff's political affiliation. <u>Reyes-Pérez v. State Ins. Fund Corp.</u>, 755 F.3d 49, 54 (1st Cir. 2014) (citing <u>Díaz-Bigio v. Santini</u>, 652 F.3d 45, 52 (1st Cir. 2011)).

The only aspect of this analysis challenged by defendants is whether plaintiffs suffered adverse employment action. Where an employee suing under § 1983 claims that a diminution in his or her duties occurred, the court must "determine whether the new work conditions would place substantial pressure on even one of thick skin to conform to the prevailing political view. This level of burden is reached . . . when the employer's challenged actions result in a work situation 'unreasonably inferior' to the norm for the position." <u>Agosto-de-Feliciano v. Aponte-Roque</u>, 889 F.2d 1209, 1219 (1st Cir. 1989).[1] To meet this standard, plaintiff must establish a change in conditions by clear and convincing evidence. <u>Id.</u> at 1220 (noting that proof of an employer's political motivation need only be proven by a preponderance of the evidence). In order to determine whether such a reduction in duties has occurred, "the factfinder should canvass the specific ways in which the plaintiff's job has changed" in order to reach a determination as to "whether the 'new' job is unreasonably inferior to the one she previously

---

[1] The year after the First Circuit Court of Appeals decided <u>Agosto-de-Feliciano</u>, the Supreme Court of the United States decided <u>Rutan v. Republican Party of Ill.</u>, stating, in dicta, that "[t]he First Amendment . . . protects state employees . . . from even an act of retaliation as trivial as failing to hold a birthday party . . . when intended to punish [them] for exercising [their] free speech rights." 497 U.S. 62, 76 n. 8 (1990) (internal quotation marks and citation omitted). The First Circuit has considered whether <u>Agosto-de-Feliciano</u>'s "unreasonably inferior" standard applies in political discrimination cases in light this language from <u>Rutan</u>. Although it has not directly ruled on this issue, the First Circuit has assumed, <i>arguendo</i>, on numerous occasions that <u>Agosto-de-Feliciano</u>'s standard continues to apply after <u>Rutan</u> in cases of alleged personnel actions short of demotions or transfer. <u>Acosta-Orozco v. Rodríguez-de-Rivera</u>, 132 F.3d 97, 101 n. 5 (1st Cir. 1997) (internal quotation marks and citation omitted); <u>see also Ortiz García v. Toledo Fernández</u>, 405 F.3d 21, 23 (1st Cir. 2005) (citing <u>Acosta-Orozco v. Rodríguez-de-Rivera</u>, 132 F.3d 97, 101 n. 5 (1st Cir. 1997)); <u>Acevedo-García v. Vera Monroig</u>, 204 F.3d 1, 12 (1st Cir. 2000); <u>Nereida-González v. Tirado-Delgado</u>, 990 F.2d 701, 705 (1st Cir. 1993).

had." Id. at 1219-20; see also Ortiz García v. Toledo Fernández, 405 F.3d 21, 23 (1st Cir. 2005) (explaining that in reduction of responsibilities cases the factfinder must determine if "the position she occupies now materially differs from the position as it existed previously."). "[T]he factfinder's responsibility, in brief, is to determine whether the employee has retained duties, perquisites and a working environment appropriate for his or her rank and title." Agosto-de-Feliciano, 889 F.2d at 1220.

     C. Velázquez

     In cases in which an employee held a trust position for a limited duration and also retained a career position, the removal of the duties associated with that trust position after a change in administration does not constitute an adverse employment action. See Ortiz García v. Toledo Fernández, 405 F.3d 21, 24 (1st Cir. 2005). ("While Ortiz held the Agronomist IV position before being promoted to a trust position, she has not presented evidence comparing her duties to her duties when she previously held the [Agronomist IV] position. Thus, a factfinder would have no way to know whether the position she occupies now materially differs from the position as it existed previously."); and Agosto-de-Feliciano, 889 F.2d 1209 ("An employee who previously had predominantly exciting and responsible work and who was left with only a few routine and technical assignments could be found to meet [the 'unreasonably inferior'] standard so long as his prior duties reflected the usual nature of his position rather than his prior high status as a member of the then-prevailing party.").

     At the times relevant to the alleged political discrimination, Velázquez served as Regional Deputy Director for the Commonwealth Sports and Recreation Department. The position of regional deputy director is a career position. ECF No. 183, at 5:4–5. In the past Velázquez has twice served as Regional Director, which is a trust position. Id., at 6:22–24. For

the four years preceding the 2012 election, Velázquez served as the de facto or interim Regional Director. ECF No. 181, at 20:4–25. On February 1, 2013, after the election of a new administration, Cruz was appointed Regional Director. ECF No. 183, at 10:6–10, 51:9–13.

Velázquez testified that he held the position of Regional Deputy Director under Regional Director David Vázquez in 2001. ECF No. 183, at 8:10–13. When asked whether he had "any problems as to performing the responsibilities and functions of deputy director" under Vázquez, he responded "I – we work real well." Id., at 8:14–17. In 2004, Velázquez also held the position of Deputy Director under Regional Director Nelson Vélez. Id., at 8:18–25. Velázquez testified that during that time "there was no problem at all." Id., at 9:1.

Under Regional Director Cruz, however, Velázquez testified that, with a few exceptions detailed below, most days he would do "nothing." ECF No. 181, at 12:24. "For seven hours – seven and a half hours per day," Velázquez testified, "I would arrive at my office in the morning, and then I would remain at my desk until the afternoon." ECF No. 181, at 12:24–25, 13:1–2. Velázquez testified that he characterized it to others as "looking at the wall and reading the newspaper all day long." ECF No. 31:15–16.

A "Job and Duty Description" document for Velázquez was duly entered into evidence at the trial. Ex. II-A.[2] Velázquez's "position classification title" is listed as "Regional Deputy Director." Ex. II-A, at 1. This document lists the following duties: collaborates in planning, coordinating, supervising and directing regional activities; collaborates in preparing and following up on work plans; stands in for the Regional Director when absent or on vacation; collaborates in formulating and evaluating the objectives and achievements of the region; drafts memoranda and communications for the Director to sign; attends to and investigates complaints

---

[2] For purposes of clarity of the record, this opinion and order maintains the same exhibit numbers/letters that were assigned at trial.

from citizens; collaborates in supervising and evaluating personnel; prepares and submits work reports; coordinates with central and regional offices to search for information and follow up on cases; provides information to government employees and visitors about department services; supervises construction, repair and maintenance projects at regional facilities; collaborates in studies aimed at maximizing the utilization of the region's resources; collaborates in drawing up and adopting quality control and performance rules for the various recreational activities; and participates in bidding processes when required to do so. Ex. II-A, at 1. Velázquez was asked with respect to each of the listed duties whether he is "performing that duty since Mr. – the new regional director, Mr. Benjamin Cruz, was appointed regional director[.]" ECF No. 183, at 14:2-4; see id., at 14:10–15, 15:3–25, 16:1–13. Velázquez testified to each that he was not performing that duty. Id. Further, with respect to the duty to stand in as Regional Director when Cruz was on vacation, Velázquez testified that Edwin González, a landscaping supervisor, had been tasked with that duty. Id., at 14:16-21, 15:1–2.

Defendants argue that the job description sheet is unclear regarding "which of those fourteen duties are inherent functions of a Deputy Regional Director and which ones are products of serving as the *de facto* Regional Director." ECF No. 188, at 6. Regarding the job description sheet, Velázquez was specifically asked, if "these are the duties that are assigned to the position you hold as a career employee." ECF No. 183, at 13:21–22. He responded, "that's true." Id., at 13:23. Thus, the jury could reasonably have concluded that this job description encompasses only those duties that Velázquez served in his career position as Deputy Regional Director rather than in his role covering the Regional Director trust position.

Defendants also argue that the jury did not hear testimony regarding the frequency with which Velázquez performed any of these duties prior to Cruz. One of the job descriptions was

"collaborates in supervising and evaluating personnel." Ex. II-A, at 1. Velázquez testified that "[t]he employees' evaluation is carried out on a daily basis. And the evaluation as such, as it was usually done in the department before, every six months, it has not been done anymore." ECF No. 181, at 106:15–18. Since, 2013, however, according to Velázquez no evaluation of personnel has been conducted. Id., at 106:20–15, 107:1–2. Further, Velázquez testified that in the previous four year terms he was invited to participate in pre-bid and bid processes. Id., at 107:13–20.

Velázquez also testified that "three or four times in two years," Cruz assigned him a duty that was not within his job description. Id., at 16:23–25, 17:1–3. Velázquez went on to testify regarding multiple such assignments none of which took more than a day to complete. Velázquez also testified that he never refused to perform any task Cruz assigned him. ECF No. 183, at 27:7–10. Velázquez was asked whether, besides the few assignments he was assigned outside his job description, he had ever "asked, assigned, performed, done, anything[.]" Id., at 26:5–7. He responded that he had not.[3] Id., at 26:21.

Velázquez testified that Cruz informed him that "he was receiving instruction from Secretary Ramón Orta" that he and Pérez "should remain in the offices at [their] respective desks without doing a thing, because he didn't want people in the hallway and he had no work instructions for [them]." Id., at 30:9–13. Velázquez testified that he complained multiple times that being deprived of his duties was "degrading" and "humiliating." Id., at 29:20–25, 30:1–2, 31:13–18. On one of these occasions, according to Velázquez, Cruz informed him that these conditions were "payment for (indiscernible) Fortuño and being an active member of the New Progressive Party." Id., at 32:6–9. Cruz also informed Velázquez and Pérez that they "should not have any expectations for the next four years." ECF No. 181, at 7:12–13. He further instructed

---

[3] Velázquez testified on cross examination that he did attend to an event that MAPFRE was holding in the parking lot of a sports and recreation department facility. He clarified, however, that upon arriving at the event he was informed that there was nothing for him to do there. ECF No. 181, at 27:15–20.

that they "were not to intervene with any activities of the department without his authorization." ECF No. 181, at 7:13–14.

Taking all inferences in favor of the non-movant, the jury could have credited that the job description was the job duties of Regional Deputy Director that Velázquez carried out without issue under two previous Regional Directors. A reasonable jury could have also determined, crediting the testimony of Velázquez, that political biases had motivated Cruz to leave him without duties. It was then for the jury to determine whether these actions constituted an unreasonably inferior position to the role of Regional Deputy Director prior to Cruz's appointment. Thus, the court cannot conclude that no reasonable jury could have found Velázquez had been deprived of his duties for political reasons.

D. Pérez

Pérez worked as a Transportation Officer at the Department of Sports and Recreation. ECF No. 176, at 5:1–6. According to his job and duty description sheet, this role consisted of the following responsibilities: recording and keeping control of official vehicles coming in and out; inspecting all vehicles under his charge; doing what is necessary for vehicle repair and maintenance; preparing requisitions for purchase of parts; keeping vehicle files and repairs up to date; asking the General Services Administration ("GSA") to decommission unusable vehicles; submitting monthly gasoline, diesel, and oil consumption reports for light and heavy vehicles and submitting a monthly report on their usage; filling out traffic accident reports; doing what is necessary for tires to be mounted onto vehicles; coordinating and making sure there are drivers for cars in special activities; preparing requisitions for motor vehicle accessories; and keeping administrative control of and ensures the renewal of forms and requests for vehicle registrations, materials, drivers' licenses, expiration dates, vehicle inspection seals. Ex. III-A, at 1. The only

duty that he continues to perform, according to Pérez, is submitting the monthly fuel consumption and usage reports. ECF No. 176, at 7:16–19, 8:10–13. Pérez testified that this duty takes him one day per month. Id., at 8:22–25, 9:1–4. Pérez testified that the remainder of the days of the month he "sit[s] in [his] office looking at the walls . . . ." ECF No. 176, at 9:5–8. When asked whether before Cruz arrived he was performing the duties, Pérez testified, "All of them. All of them. All of them." Id., at 9:11–13.

On cross examination, Pérez testified that on March 3, 2015, he recommended the decommissioning of a vehicle. ECF No. 188-2, at 9. Pérez also completed an inspection report and conceded that no one prevented him from completing the duty of inspecting vehicles. ECF No. 188-2, at 11–12. Pérez agreed that he had also completed paperwork regarding the acquisition of vehicle parts. ECF No. 188-2, at 13–18. Pérez agreed that no one prevented him from completing this duty. Id. Similarly, Pérez completed and no one prevented him from completing documentation regarding provisional licenses and permits for vehicles. ECF No. 188-2, at 19–23. These documents were signed on June 26, 2013 and June 28, 2015. ECF No. 188-2, at 21–23. Further, with regard to the one vehicle accident that occurred while Cruz has been director, Pérez completed the relevant paperwork. ECF No. 188-2, at 26–27. On re-direct, Pérez testified that for at least the year 2014, all the documents he was confronted with were completed on eleven different days, but that he had no other task or job in 2014. ECF No. 174, at 27–29.

These disparities in testimony are appropriately left to the province of the jury. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). A reasonable jury could have concluded that, although Pérez sporadically and

occasional performed duties listed in his job description, this was unreasonably inferior to his previous position. In light of the foregoing, the motion for judgment as a matter of law (ECF No. 188) is DENIED.

**III.    MOTION TO SET ASIDE VERDICT**

A.  Punitive Damages in Absence of Compensatory or Nominal Damages

Defendants argue that the punitive damages cannot stand without either compensatory of nominal damages. ECF No. 172, at 4. It is true that "generally a claimant may not recover punitive damages without establishing liability for either compensatory or nominal damages." Kerr-Selgas v. Am. Airlines, Inc., 69 F.3d 1205, 1214 (1st Cir. 1995). This case falls into a recognized exception to this generality. "[I]n a section 1983 action, a jury may properly award punitive damages even if it awards no nominal or compensatory damages." Cortes-Reyes v. Salas-Quintana, 608 F.3d 41, 53 (1st Cir. 2010) (holding that nominal damages weren't required "to validate the jury's award of punitive damages for the violation of the First Amendment rights"); De Jesus Nazario v. Morris Rodriguez, 554 F.3d 196, 204-06 (1st Cir. 2009) ("In light of the nearly universal authority counseling against applying the Kerr–Selgas rule to section 1983 actions, we hold that the Kerr–Selgas rule does not (and henceforth will not) apply to such cases."). Because plaintiffs prevailed on their § 1983 claim, there is no absolute bar on the recovery of punitive damages in the absence of other damages.

B.  Punitive Damages under Due Process

Defendants also argue that amount of punitive damages awarded is grossly excessive in violation of the Fourteenth Amendment due process guarantees. ECF No. 172, at 6. "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S.

408, 417 (2003). "Assuming that fair procedures were followed, a judgment that is a product of that process is entitled to a strong presumption of validity." TXO Prod. Corp. v. All. Res. Corp., 509 U.S. 443, 457 (1993) (plurality).

Whether an award of punitive damages comports with due process is measured by three principle considerations: the degree of reprehensibility of defendant's conduct; the ratio between the harm or potential harm suffered by a plaintiff and the punitive damages award; and the difference between this remedy and the civil and criminal penalties authorized or imposed for comparable conduct. Romano v. U-Haul Int'l, 233 F.3d 655, 672-73 (1st Cir. 2000) (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)).[4] The punitive damages award will stand unless it is "'certain' that the amount in question exceeds that necessary to punish and deter the alleged misconduct." Id.

### i. *Degree of Reprehensibility*

The first factor, degree of reprehensibility, is often referred to as the most important. See, Gore, 517 U.S. at 575. Based on the principle that some wrongs are "more blameworthy than others," this often works by comparison to other misconduct. Gore, 517 U.S. at 575–76. Over time the emerging considerations are whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." Campbell, 538 U.S. at 419 (2003). "It is appropriate to

---

[4] The parties were ordered on March 22, 2016 to further brief these factors as they were inadequately addressed in previous briefings. ECF No. 200. In plaintiffs' supplemental memorandum of law, plaintiffs argue that the Gore factors do not control the award here. ECF No. 206. Specifically, plaintiffs highlight that the award in Gore was entered by a state court jury, whereas this case involves a federal jury. Id., at 5. The First Circuit Court of Appeals has regularly applied Gore to determine whether a punitive damages awarded in a § 1983 case by a federal jury are excessive. See Méndez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 47–48 (1st Cir. 2009) ("We have regularly applied this due process limit to punitive damages awards under federal law, particularly in section 1983 actions."); Romano, 233 F.3d 655.

consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." <u>TXO Prod. Corp.</u>, 509 U.S. at 460.

Here the harm the jury recognized was neither physical nor economic in nature, but rather was a moral or reputational harm. Similarly, plaintiffs were not targeted for any financial vulnerability. There is also no allegation here that defendants' behavior posed any risk to the health or safety of others.

On the other hand, the actions at issue here, as credited by the jury, were not an isolated incident. Rather defendants, over the span of a year or more, systematically deprived the plaintiffs of their job duties, resulting in their jobs becoming unreasonable inferior to their previous positions. Furthermore, the jury found that the plaintiffs proved that their political affiliation "was a substantial and motivating factor in the adverse employment action" that defendants took. ECF No. 167, at 1, 3. The jury also found that Cruz's conduct was "malicious or in reckless disregard" of plaintiffs' constitutional rights. <u>Id.</u> at 3, 5.

Plaintiffs, arguing in support of the punitive damages award, also highlight that they suffered damages that were not purely economic. Specifically, Velázquez points to testimony that he felt humiliated and feared he would lose his job. Pérez similarly points to testimony that he felt humiliated, but also that he began taking medication as a result and had trouble sleeping.

On balance, this factor weighs against the current punitive damages award. This conduct, although wrongful, does not rise to the level of severe reprehensibility that would make it more blameworthy than other political discrimination cases or discrimination cases in general.

ii. *Ratio*

The second factor requires examining the ratio between the harm or potential harm suffered by a plaintiff and the punitive damages award. There is no bright line rule or "simple mathematical formula" to determine the reasonableness of this ratio. <u>Gore</u>, 517 U.S. at 582. "Indeed, low awards of compensatory damages may properly support a higher ratio than compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." <u>Id.</u> The Supreme Court has stated that "[o]ur jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." <u>State Farm Mut. Auto Ins. Co. v. Campbell</u>, 538 U.S. 408, 424 (2003) (holding that the 145:1 ration was excessive). Similarly, in <u>Gore</u> the Court noted that "[w]hen the ratio is a breathtaking 500 to 1 . . . the award must surely 'raise a suspicious judicial eyebrow.'" 517 U.S., at 583 (quoting <u>TXO</u>, 509 U.S., at 481) (holding, after analyzing all three factors that the Court was "fully convinced that the grossly excessive award imposed in this case transcends the constitutional limit.").

Although the First Circuit Court of Appeals has not addressed this issue, other courts have abandoned the ratio prong when the jury awarded only nominal damages. The Second Circuit Court of Appeals addressed this issue in a malicious prosecution case where the jury awarded $1 in nominal damages and $200,000 in punitive damages. <u>Lee v. Edwards</u>, 101 F.3d 805, 807 (2d Cir. 1996). After delineating the jurisprudence of acceptable ratios, the court declined to call the award "breathtaking," explaining that "in a § 1983 case in which the

compensatory damages are nominal, a much higher ratio can be contemplated while maintaining normal respiration." <u>Id.</u>, at 811. The court then concluded "[s]ince the use of a multiplier to assess punitive damages is not the best tool here, we must look to the punitive damages awards in other civil rights cases to find limits and proportions." <u>Id.</u>; <u>see also</u>, <u>Arizona v. ASARCO LLC</u>, 773 F.3d 1050 (9th Cir. 2014) ("Because nominal damages measure neither damage nor severity of conduct, it is not appropriate to examine a ratio of a nominal damages award to a punitive damages award."); <u>Williams v. Kaufman County</u>, 352 F.3d 994, 1016 (5th Cir. 2003) ("[W]e agree with the district court that any punitive damages-to-*compensatory* damages 'ratio analysis' cannot be applied effectively in cases where only *nominal* damages have been awarded, such as the § 1983 suit before us.").

As addressed above, there is no requirement for there to be nominal damages in this § 1983 case for the punitive damages to stand. The ratio analysis, nevertheless, presents the same concerns in a case with no nominal damages as it does in a case with $1 nominal damages. This is because even a small punitive damage award, for example of $550, would immediately surpass the breathtaking 500:1 in <u>Gore</u>. Yet, the award itself, evaluated independent of the ratio, could hardly be considered breathtaking. In light of these considerations, the ratio analysis will be bypassed in this case.

### iii.   Civil Penalties in Comparable Cases

"Under the final [<u>Gore</u>] guidepost, we consider the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." <u>Mendez-Matos v. Municipality of Guaynabo</u>, 557 F.3d 36, 55 (1st Cir. 2009). Although deference is typically afforded to "legislative judgment about the appropriate sanction," Congress has not addressed damage awards appropriate under § 1983. <u>Id.</u> Instead, the court must

look at awards in similar § 1983 suits, focusing first within our own circuit and expanding outward if necessary. Id. Here this involves canvassing cases in which political discrimination motivated a deprivation of duties.

In the most similar case in this jurisdiction, the plaintiff was a public employee transferred to a different office where he was deprived of all duties. Acevedo Luis v. Zayas, 419 F.Supp.2d 115, 118 (D.P.R. 2006). The plaintiff in that case also reported feeling humiliated. Id., at 120. The jury in that case found that plaintiff's new position was unreasonable inferior and that there was a politically discriminatory animus being the position change. The jury awarded $5,000 in punitive damages without the imposition of compensatory damages. Id., at 118. The court, in upholding that award, stated that "[t]he amount is not excessive if one considers that a reasonable jury could find that a dedicated competent public employee with a clean employment record, a local director of the Department of the Family, suddenly found himself with veritably nothing to do, a status which can be termed degrading and humiliating for someone accustomed to great responsibility, a responsibility with which plaintiff obviously had complied prior to his transfer . . . . Together with the evidence of juxtaposing adverse, strong political affiliations was sufficient to support the award of punitive damages." Id., at 128.

In a case in the Northern District of Illinois, a jury found that twenty-one correctional officers were politically discriminated against when their specialized unit was disbanded. Burruss v. Cook Cty Sheriff's Office, No. 08 C 6621, 2013 WL 3754006, *1 (N.D. Ill. July 15, 2013). The plaintiffs there "lost no pay or employment benefits. They suffered no loss beyond a change in daily job responsibilities—a change that arguably did nothing more harmful than returning an otherwise-exalted set of officers to the rank and file." Id., at *12. The court reduced the punitive damages award from $210,000 to $10,000. Id.

Here, each plaintiff was awarded $250,000. ECF No. 167, at 3, 5. This factor weighs heavily against upholding the punitive damages award. Looking at the reprehensibility factor together with the comparison to similar cases, the award here is grossly excessive in violation of due process. Therefore, defendants' motion to set aside the verdict (ECF No. 172) is GRANTED IN PART.[5] Defendants seem to request that the punitive damages award be remitted in its entirety, but that the verdict of liability stands. Because the jury made sufficient factual findings that plaintiffs were entitled to punitive damages, the request for a full remittitur is DENIED. Rather, the First Circuit has indicated that the appropriate remedy is conditional remittitur or new trial. See Bisbal-Ramos v. City of Mayagüez, 467 F.3d 16, 26–27 (1st Cir. 2006). The most that the evidence on the record would support here is $10,000 per plaintiff. This amount takes into account the evidence on the record as well as the award in Acevedo Luis, taking into account that ten years have passed since that verdict. Plaintiffs can either accept the remittitur or proceed to a new trial. Should plaintiffs choose to proceed to a new trial, then the verdict against defendants shall be vacated in its entirety and a new trial shall be held on both liability and damages. Plaintiffs shall inform their decision by November 6, 2016.

IT IS SO ORDERED

In San Juan, Puerto Rico, this 23rd day of September, 2016.

s/Marcos E. López
U.S. Magistrate Judge

---

[5] Defendants' motion is titled a "Motion to Set Aside Verdict." ECF No. 172. Because defendant is challenging the procedural guarantees rather than sufficiency of the evidence, it is treated as a motion for remittitur of the damages award under Federal Rule of Civil Procedure 59.